BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
fbottini@bottinilaw.com
Albert Y. Chang (SBN 296065)
achang@bottinilaw.com
Yury A. Kolesnikov (SBN 271173)
ykolesnikov@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002

*Attorneys for Plaintiff Alfio Conti*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

ALFIO CONTI, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

SAN FRANCISCO ASSOCIATION OF REALTORS, NATIONAL ASSOCIATION OF REALTORS, GREATER SAN DIEGO ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., COMPASS SF I, INC., SOTHEBY'S INTERNATIONAL REALTY, HOMESERVICES OF AMERICA, INC., RODEO REALTY, INC., RE/MAX HOLDINGS, INC., and KELLER WILLIAMS REALTY, INC.,

Defendants.

Case No. _______________

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, THE SHERMAN ACT, THE CALIFORNIA UNFAIR COMPETITION LAW, AND UNJUST ENRICHMENT**

**DEMAND FOR JURY TRIAL**

Plaintiff Alfio Conti ("Plaintiff"), individually and on behalf of all others similarly situated, asserts the following against Defendants San Francisco Association of Realtors ("SFAR"), National Association of Realtors® ("NAR"), Greater San Diego Association of Realtors ("SDAR"), Rodeo Realty, Inc., Sotheby's International Realty, Compass SF I, Inc., Realogy Holdings Corp., HomeServices of America, Inc., RE/MAX LLC, and Keller Williams Realty, Inc. (collectively, "Broker Defendants" and together with SFAR, NAR, and SDAR "Defendants") based upon personal knowledge, where applicable, information and belief, and the investigation of counsel.

## INTRODUCTION

1. This is a class action on behalf of consumers who have been overcharged for residential real estate commissions due to the anti-competitive conduct of Defendants. For decades, real estate agents who belong to the NAR have represented that the services of agents representing home purchasers are free. In reality, this is far from the truth, as Defendants' conduct has resulted in artificially inflated commissions, which in turn lead to higher home prices paid by buyers.

2. The NAR is a trade group with over 1.4 million members. The NAR amasses a huge war chest by collecting membership dues from real estate agents, which it uses to lobby federal and state governments on various issues relevant to the real estate business. In exchange, real estate agents who join the NAR receive benefits, including access to the "multiple listing service" which is critical to being able to represent consumers in residential real estate transactions.

3. Among other activities, the NAR establishes and enforces rules, policies, and practices that are then adopted by NAR's more than 1,400 local associations (also known as the "Member Boards") and their affiliated MLSs. These rules, policies, and practices govern the conduct of the approximately 1.4 million MLS Participants or REALTORS® affiliated with NAR who are engaged in residential real estate brokerages across the United States.

///

4. When an agent joins the NAR, she or he is required by the NAR to agree to be bound by the NAR's rules, practices, and guidelines. These rules, which include a requirement that sellers set aside a portion of the purchase price for buyer agent commissions, prohibitions on modifying the commission, and permission to filter listings by commission, all enable NAR, its co-defendants, and its members to maintain buyer agent commissions at supra-competitive levels unrelated to the services provided, steer home buyers away from lower commission homes, and drive out discounters.

5. Brokers use Multiple Listing Services ("MLSs") to share information about homes for sale. The vast majority of homes in the United States are sold on an MLS. An MLS is a joint venture among competing brokers to facilitate the publishing and sharing of information about homes for sale in a geographic area. The NAR, through its Member Boards, controls a substantial number of the MLSs in the United States. NAR promulgates rules, policies, and practices governing the conduct of NAR-affiliated MLSs that are set forth annually in the Handbook on Multiple Listing Policy ("Handbook").

6. Under the terms of the Handbook, affiliated REALTOR® associations and MLSs "must conform their governing documents to the mandatory MLS policies established by [NAR's] Board of Directors to ensure continued status as member boards and to ensure coverage under the master professional liability insurance program." (National Association of REALTORS®, Handbook on Multiple Listing Policy 2020 (32nd ed. 2021), at iii).[1]

7. The membership of an MLS is generally comprised of nearly all residential real estate brokers and their affiliated agents in an MLS's service area. In each area an MLS serves, the MLS will include or "list" the vast majority of homes that are for sale through a residential real estate broker in that area. In most areas, the local MLS

---

[1] *Available at* https://cdn.nar.realtor/sites/default/files/documents/2021_NAR_ HMLP_ 210112.pdf. (last visited Mar. 16, 2021).

provides the most up-to-date, accurate, and comprehensive compilation of the area's home listings. Listing brokers use the MLS to market sellers' properties to other broker and agent participants in the MLS and, through those other brokers and agents, to potential home buyers.

8. By virtue of nearly industry-wide participation and control over important data, MLSs possess and exercise market power in the markets for the provision of real estate brokerage services to home buyers and sellers in local markets throughout the country.

9. Defendants' unlawful conduct was recently exposed when, on November 19, 2020, the United States filed a civil antitrust Complaint against Defendant National Association of REALTORS® ("NAR") in Washington, D.C. alleging that a series of rules, policies, and practices promulgated by the NAR resulted in a lessening of competition among real estate brokers and agents to the detriment of American home buyers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Complaint alleges that certain NAR rules, policies, and practices have been widely adopted by NAR's members, including the multiple listing services affiliated with the NAR that facilitate the publishing and sharing of information about local homes for sale, resulting in reduced competition among real estate brokers and agents.

10. Plaintiff and Class Members in the present case are home buyers who purchased their homes on MLSs affiliated with and governed by the NAR, such as Defendants San Francisco Association of Realtors and San Diego Association of Realtors. Plaintiff brings this action against the NAR, the SFAR, the SDAR, and the Broker Defendants, for agreeing, combining, and conspiring to impose, implement, and enforce anticompetitive restraints that reduce price competition in the markets for buyer agent services in violation of federal and state antitrust law. Defendants' unlawful, anticompetitive conduct causes home buyers to pay inflated commissions for broker services that are misrepresented to be free, to pay inflated prices for the homes they purchase, and to receive reduced quality broker services.

11. The SFAR and SDAR are trade associations of real estate professionals located in San Francisco and San Diego, respectively. They operate multiple listing services in the San Francisco Bay Area and in San Diego County.

12. The NAR, the Broker Defendants, and their co-conspirators collectively possess market power in the market for buyer agent services through their control of NAR-affiliated MLSs. NAR MLSs are the dominant MLSs in the United States. Even some independent MLSs require brokers to be members of the NAR to access their database. Over 200,000 real estate professionals across the United States have registered with the NAR to access its benefits, including MLSs, which are essential to selling and finding homes for their clients. Pursuant to Defendants' conspiracy, however, NAR members may access NAR's benefits, including the right to list their properties on NAR MLSs, only if they agree to adhere to and implement NAR's rules, policies, and practices. The NAR and Broker Defendants have adopted a series of rules, policies, and practices that significantly restrain competition.

13. The NAR imposes certain anticompetitive rules, policies, and practices on NAR MLSs. The NAR also recommends certain rules, policies, and practices that NAR MLSs have widely adopted. The NAR's anticompetitive rules, policies, and practices include:

a. requiring every seller-broker, when listing a property on an MLS, to make a "blanket unilateral offer[] of compensation" to any buyer agent who may find a buyer for the home;

b. requiring that the offer of compensation to the buyer agent be a blanket offer — *i.e.*, the exact same compensation terms must be simultaneously offered to every buyer agent without regard to their experience, the services they are providing to the buyer, or the financial arrangement they have made with the buyer;

///

///

c. prohibiting the disclosure of the total commission — the commission due to the seller-broker and the portion of the commission earmarked for the buyer agent — for any listing on an NAR MLS;

d. permitting buyer agents to misrepresent to buyers that a buyer agent's services are free;

e. permitting and enabling buyer agents to filter MLS listings based on the offered commissions and to exclude lower-commission homes from consideration by prospective home buyers;

f. severely restricting brokers' ability to modify the buyer agent commission after the buyer agent conveys a purchase offer; and

g. limiting access to the lockboxes that provide physical access to homes to members of the NAR.

14. The NAR's rules, policies, and practices have been adopted and enforced by NAR members, including NAR MLSs, and are, therefore, agreements among competing real estate brokers. Defendants' implementation of and adherence to these agreements is manifestly anticompetitive.

15. Because the Broker Defendants are leading real estate firms in the United States, their participation in the conspiracy is essential to its success. The Broker Defendants have agreed to participate in, facilitate, and implement the conspiracy. Each of the Broker Defendants play an active role in the NAR and has required franchisees, brokerages, and individual realtors to join in and implement the NAR's anticompetitive agreements as a condition to receiving the benefits of each Broker Defendant's brand, brokerage infrastructure, and other support.

16. The Broker Defendants use their control of the MLSs and their own governing policies to ensure adherence to NAR rules. For example, Keller Williams' Policies & Guidelines Manual provides "[w]e expect all of our associates to adhere to the National Association of REALTORS® Code of Ethics." The Broker Defendants further implement the conspiracy by reviewing and reissuing NAR's rules at yearly

NAR meetings and serving on the boards and committees that enforce compliance with NAR's rules.

17. Defendants' conspiracy has substantially reduced competition in the market for buyer agent services to the detriment of American home buyers. Specifically, Defendants' conspiracy enables brokers to raise, fix, and maintain buyer agent compensation at artificially high levels that would not exist in a competitive marketplace, which in turn causes home buyers to pay higher prices. The conspiracy also enables brokers to "steer" home buyers away from lower commission homes. As a result, home buyers are harmed in at least the following ways:

a. the conspiracy has inflated the cost of buyer agent services by inflating buyer agent commissions;

b. since buyer agent commissions are paid out of the price buyers pay for their homes, inflated buyer agent commissions in turn have inflated home prices; and

c. the conspiracy has reduced the quality of services provided by buyer agents by, for example, facilitating the steering of home buyers by their brokers towards higher-commission homes and away from lower-commission homes, even though such homes may otherwise match buyers' criteria.

18. Plaintiff and the other class members have each incurred at least thousands of dollars in overcharges as a result of Defendants' conspiracy.

19. Defendants' agreements, individually and collectively, unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Cartwright Act. Plaintiff, on behalf of himself and the class, sues Defendants for violations of the federal antitrust laws and California's Cartwright Act, as alleged herein, and seeks treble damages, injunctive relief, and the costs of this lawsuit, including reasonable attorneys' fees.

///

## JURISDICTION AND VENUE

20. The Court has federal-question jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1337. This case arises under Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1.

21. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2), because the class contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of each class is a citizen of a State different from Defendants.

22. This Court has personal jurisdiction over Defendants. Defendants have: (1) transacted business in the United States, including in this District; (2) transacted with members of the Class throughout the United States, including in this District; (3) had substantial contacts with the United States, including in this District; and (4) committed substantial acts in furtherance of their unlawful scheme in the United States, including in this District.

23. Venue is proper in this District under 28 U.S.C. §1391(b), (c), and (d). Each Defendant transacted business, was found, had agents, and/or resided in this District; a substantial part of the events giving rise to Plaintiff's claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## INTRADISTRICT ASSIGNMENT

24. In compliance with Local Rule 3-2(d), Plaintiff requests that this action be assigned to the San Francisco Division of this District because a substantial part of the events or conduct giving rise to the claims in this action occurred in the County of San Francisco.

## TRADE AND COMMERCE

25. The NAR's anticompetitive rules apply to and have been implemented and enforced by Defendants and coconspirators nationwide. These rules govern the

conduct of local NAR associations, local brokers, and local realtors across the United States. Defendants' conduct alleged herein has, among other harms, inflated buyer agent commissions nationwide, including in the areas in which the NAR MLSs operate. Defendant NAR, through its members and other coconspirators, and Broker Defendants, through their franchisees, brokers, and other coconspirators, are engaged in interstate commerce and activities affecting interstate commerce in the United States.

## THE PARTIES

### I. Plaintiff

26. Plaintiff Alfio Conti is a resident of California. In September 2020, Plaintiff purchased a home in San Diego, California utilizing a buyer agent. The home Plaintiff purchased was listed on the Greater San Diego Association of Realtors' Multiple Listing Service, Inc., which is an NAR member broker and adheres to NAR's guidelines and policies.

### II. Defendants

27. Defendant San Francisco Association of Realtors is a trade association of real estate professionals located in San Francisco, California. It claims to represent over 4,000 real estate agents in San Francisco and is headquartered at 301 Grove Street, San Francisco, California 94102. It operates a multiple listing service in the San Francisco Bay Area. Defendants Compass and Sotheby's International Realty are members of the San Francisco Association of Realtors.

28. Defendant NAR is a trade association. It has over 1.4 million members and is the leading national trade association of real estate brokers and agents. It oversees fifty-four state and territorial realtor associations and about 1,200 local realtor associations. Among its members are licensed residential real estate brokers, including brokers who provide real estate brokerage services to home sellers, home buyers, or both.

29. Defendant Greater San Diego Association of Realtors is a trade association of real estate professionals located in San Diego, California. Its website states that

"Today, the Greater San Diego Association of REALTORS® is one of the largest REALTOR® associations in California and the United States with 20,000 members." It is headquartered at 4845 Ronson Court, San Diego, California 92111. It operates a multiple listing service in San Diego County.

30. Defendant Realogy Holdings Corp. is the nation's largest real estate brokerage company. Realogy is headquartered in Madison, New Jersey, and is a publicly traded corporation with a market value in excess of $4 billion and sales of $504.21 billion in 2019 alone. Realogy owns, operates, and franchises many real estate brokerage firms, including Century 21, Coldwell Banker, Sotheby's International Realty, The Corcoran Group, Better Homes and Garden Real Estate, ZipRealty, ERA Real Estate, and Citi Habitats.

31. Defendant Compass is one of the nation's largest real estate brokerages and its agents are members of the NAR, the California Association of Realtors ("CAR"), and the San Francisco Association of Realtors. Compass allows its name to be used by numerous member brokerages, including Compass SF I, Inc. Compass has corporate offices at 891 Beach Street, San Francisco, California 94109 and 1400 Van Ness Avenue, San Francisco, California 94109. Compass claims to have engaged in $23.99 billion in gross sales volume in its San Francisco Bay Area offices in 2019. At all relevant times, Compass has been actively involved in efforts to perpetuate the anti-competitive practices alleged herein in concert with the NAR, CAR, and local real estate associations. Betty Taisch and Jeannie Anderson, real estate agents with Compass in San Francisco, have served as Directors of the California Association of Realtors for the 2019-2021 term. Eugene Pak, a real estate agent with Compass in San Francisco, is serving as a Director of the CAR for the 2021–2023 term. Richard Sax, a real estate agent with Compass in San Francisco, is listed as a Director-for-Life of the CAR.

32. Defendant Sotheby's International Realty is one of the nation's largest real estate brokerages and is a member of the NAR, the CAR, and the San Francisco Association of Realtors. Sotheby's maintains an office at 117 Greenwich Street, San

Francisco, California 94111. Sotheby's claims to have engaged in $2.27 billion in gross sales volume in its San Francisco Bay Area offices in 2019. At all relevant times, Sotheby's has been actively involved in efforts to perpetuate the anti-competitive practices alleged herein in concert with the NAR and local real estate associations. John Asdourian, a real estate agent with Sotheby's International Realty in San Francisco, has served as a Director of the CAR for the 2019-2021 term. David Parry, a real estate agent with Sotheby's International Realty in San Francisco, is serving as a Director of the CAR for the 2021-2023 term.

33. Defendant HomeServices of America, Inc. is one of the nation's largest real estate brokerages. HomeServices is an affiliate of Berkshire Hathaway headquartered in Minneapolis, Minnesota, and owns, operates, and franchises many real estate brokerage firms, including HomeServices, Prudential Real Estate, Real Living, and Edina Realty. In 2019, HomeServices' annual sales were $206.08 billion.

34. Defendant Rodeo Realty, Inc. is one of the nation's largest independently-owned real estate brokerages. It is headquartered at 9171 Wilshire Boulevard, Suite 321, Beverly Hills, California 90210. Rodeo Realty has more than 1,200 licensed agents and brokers and 12 offices throughout Los Angeles and Ventura Counties.

35. Defendant RE/MAX Holdings, Inc. is also one of the nation's largest real estate brokerages. RE/MAX is headquartered in Denver, Colorado, and is publicly traded, with a market value of approximately one billion dollars and sales of $269.93 billion in 2019. It franchises local RE/MAX brokers around the country, which have approximately 6,800 offices and more than 100,000 sales associates.

36. Defendant Keller Williams Realty, Inc. is a privately held company headquartered in Austin, Texas and is one of the nation's largest real estate brokerages. Keller Williams franchises local Keller Williams brokers around the country, which have approximately 940 offices and more than 180,000 sales associates. Keller Williams has offices in San Francisco located at 1624 California Street, 775 Monterey Blvd., 2207 Lombard Street, 582 Castro Street, and other locations. Keller Williams is operated by

holding company KWx, which was formed in 2020. In 2019, Keller Williams realized $336.59 billion in sales.

**III. Coconspirators**

37. Multiple local realtor associations not named as Defendants participated as coconspirators in the violations alleged herein and performed acts in furtherance thereof. Specifically, each of the local realtor associations that own and operate the NAR MLSs agreed to, complied with, and implemented the Buyer Agent Commission Rule.

38. The NAR MLSs, among others, have participated as coconspirators in the violations alleged herein and performed acts in furtherance thereof, including by adopting the Buyer Agent Commission Rule in their individual rules and regulations.

39. Franchisees and brokers of Defendant corporations also participated as coconspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. Specifically, each complied with and implemented the Buyer Agent Commission Rule in the geographic areas where the NAR MLSs operate. In addition, other brokers in these areas have participated as coconspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. These other brokers complied with and implemented the Buyer Agent Commission Rule in these geographic areas.

40. Defendants are jointly and severally liable for the acts of their coconspirators, whether named or not named as defendants in this Complaint.

## BACKGROUND ON THE NAR AND THE REAL ESTATE INDUSTRY

**I. The NAR and Affiliated MLSs**

41. The NAR is the largest trade association in America, composed of REALTORS® (real estate agents registered with the NAR), including residential and commercial brokers, salespeople, property managers, appraisers, counselors, and others engaged in the real estate industry across the United States. Members belong to one or more of NAR's approximately 1,200 local associations or boards and/or 54 state and territory associations. The NAR's local associations and affiliated MLSs govern the

conduct of NAR's 1.4-million-member REALTORS®.

42. The NAR establishes and enforces rules, policies, and practices that are adopted by NAR's local associations and their affiliated MLSs and, in turn, must be complied with by REALTORS®. Membership in the NAR provides real estate professionals with a number of benefits, including liability insurance, access to MLSs, trainings, and more.

43. Home sellers and buyers are typically represented by brokers, including those registered with the NAR. According to the NAR, in 2020, 89% of sellers sold their home with assistance from a seller-broker, and 88% of buyers purchased their home with assistance from a buyer agent.

44. State licensing laws regulate who can represent sellers and buyers in the real estate market. Two categories of entities may be licensed under state law: (1) the real estate broker (also known as a "brokerage firm"); and (2) the individual real estate licensee or agent. Real estate brokers are legally responsible for the activities of their licensed agents.

45. Licensed brokers are the only entities permitted by state law to be paid to represent buyers or sellers in a real estate transaction. For that reason, all contracts for real estate services must be with brokers, not agents, and all payments are made to brokers, not agents. Brokerage firms pay their individual agents. For ease of reference, this Complaint generally refers to brokers and agents interchangeably.

46. Brokers typically share and find information about houses for sale on an MLS. An MLS is a database of properties listed for sale in a defined region that is accessible to real estate brokers and their individual realtors so long as they comply with the rules of the MLS. MLSs function as joint ventures between real estate brokers to publish and share information about property listings in specified geographic areas.

47. MLSs also act as the main sources of listings for online websites, such as Zillow, through which many prospective home buyers find homes. However, the local MLS provides the most up-to-date, accurate, and comprehensive compilation of the

area's home listings.

48. Due to near industry-wide participation and control over important data, brokers offering MLSs possess and exercise power in the markets for the provision of real estate brokerage services to home buyers and sellers throughout the country. If a seller-broker does not list a client's property on an MLS, many buyer agents will not show that property to prospective buyers.

49. The NAR controls a substantial number of the MLSs in the United States. The NAR MLSs are owned and operated by local realtor associations that are members of, and governed by, NAR. NAR's map of affiliated MLSs reflects NAR's wide reach.[2]

50. The NAR promulgates rules, policies, and practices that govern the conduct of NAR-affiliated MLSs that are set forth annually in the NAR's Handbook. Under the terms of the Handbook, NAR members and MLSs must conform their policies with those established by NAR's Board of Directors.

51. The NAR and its affiliated REALTOR® associations and MLSs enforce the Handbook's rules, policies, and practices as well as the rules, policies, and practices set forth in NAR's Code of Ethics. NAR's Code of Ethics states that "[a]ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership" in the NAR. (National Association of REALTORS®, Procedures for Consideration of Alleged Violations of Article IV, Section 2, Bylaws).

## II. Broker Compensation

52. The standard practice in the residential real estate industry is to compensate brokers and agents with commissions that are calculated as a percentage of a home's sale price. Commissions are paid when the home sells.

53. The seller-broker's compensation is specified in a listing agreement, a

[2] MLS Map of the National Association of Realtors®, NAR, https://www.nar.realtor/mls-map-of-the-national-association-of-realtors (last visited Jan. 12, 2021).

contract between the seller and the seller-broker that details the terms of the seller-broker services, such as requiring that property be listed on an MLS. The listing agreement specifies the total commission that a home seller will pay to the seller-broker, often with a portion of that amount earmarked to be paid to the buyer agent in the event the buyer has a broker.

54. The buyer agent is typically compensated with a portion of the total commission paid to the seller-broker, which the buyer agent receives if her client purchases the seller's home. When a buyer retains a broker, the buyer enters into a contract with that broker, which typically discloses that the buyer agent will be compensated out of the total commission.

55. The following example illustrates how this process typically works:

- A homeowner enters into a contract with a seller-broker, in which the seller agrees to pay the seller-broker six percent in total commissions in exchange for marketing and facilitating the sale of the home.
- The seller-broker then makes a blanket, unilateral offer of a three percent commission to every buyer agent when it lists the home on the MLS.
- A buyer agent shows the property to a buyer client, who buys the home for $500,000.
- The buyer pays the $500,000 purchase price into an escrow account. The escrow company then simultaneously transmits the seller-broker's commission (three percent of the sales price or $15,000) to the seller-broker, the buyer agent commission (three percent of the sales price or $15,000) to the buyer agent, and the net amount due to the seller.

56. Buyer agent fees are paid out of the funds from the purchase price of the house — a price the home buyer pays. But, because the buyer agent commission is ostensibly paid by the seller, buyers do not necessarily realize that the broker commission is added to the purchase price of the home such that buyers are sharing the

cost of the commission with the seller. This fact is obscured further by NAR's Code of Ethics, which permits and encourages buyer agents to tell their clients that their services are free. In fact, home buyers pay a high price for these "free" services in the form of super competitive purchase prices and buyer agent commission rates as well as reduced quality of buyer agent services.

## III. Defendants' Market Power in the Market for the Provision of Buyer Agent Services

57. The relevant service market for the claims asserted herein is the market for buyer agent services. The relevant geographic markets for the claims asserted herein are the geographic areas in which NAR MLSs operate. This market comprises the bundle of services provided to home buyers by residential real estate brokers with access to the NAR MLSs. Defendants' control of the NAR MLSs gives Defendants the ability to impose the Buyer Agent Commission Rule and other anticompetitive NAR rules on class members and other market participants. Access to NAR MLSs is critical for brokers to compete and to assist home buyers where those MLSs operate.

58. Upon information and belief, NAR and the Broker Defendants, through their coconspirator franchisees and other conspiring brokers where the NAR MLSs operate, collectively provide the majority of the residential real estate broker services in these areas.

59. Defendants and their coconspirators collectively have market power in each relevant market through their control of the local MLS and their dominant share of the local market.

60. Any buyer agents in the areas in which the NAR MLSs operate who wished to compete outside of Defendants' conspiracy would face insurmountable barriers. Defendants' control of the NAR MLSs through themselves and their coconspirators means that non-conspiring brokers would need to establish an alternative listing service to compete with the conspiring brokers, or alternatively, attempt to compete without access to a listing service. A seller-broker who represented a seller without using a

listing service would lose access to the large majority of potential buyers, and a buyer agent who represented a buyer without using a listing service would lose access to the large majority of sellers. Brokers cannot compete effectively without access to a listing service.

61. For an alternative listing service to compete effectively with one of the NAR MLSs, the alternative would require listings as comprehensive as the NAR MLS. Brokers and their individual realtors who currently profit from inflated buyer agent commissions have minimal incentive to participate in an alternative listing service that would generate lower buyer agent commissions and lower total commissions. Further, many buyers would be very reluctant to retain a buyer agent operating on an alternative listing service that required them to pay the buyer agent commission when other buyer agents operating on the NAR MLSs represent that they are entirely compensated by home sellers. Accordingly, seller-brokers on an alternative listing service would struggle to attract buyer agents and their buyer clients. And buyer agents would be reluctant to use a listing service with limited properties. Accordingly, a listing service attempting to compete with any of the NAR MLSs would likely fail to attract enough property listings to operate profitably and act as a competitive constraint on the incumbent MLSs. The absence of listing services that effectively compete with the NAR MLSs (or other MLSs) reflects very substantial barriers to entry.

62. The NAR also advises MLSs that non-compete agreements are a "critical component" of any agreement between MLSs and third-party websites, such as Zillow, that may wish to access the MLSs data. The NAR's checklist of "critical components" states that any non-compete should include provisions that the third-party website "must agree they will not compete with the brokerage firms or MLS by either becoming a licensed brokerage firm or by providing offers of cooperation and compensation." Further, the NAR advises that the non-compete agreement should require the third-party website to agree not to "use the data in a manner that is similar to a Multiple Listing Service." Thus, the NAR, in furtherance of the conspiracy, has advised MLSs to

take affirmative steps to prevent third-party websites from becoming competitors.

## THE ANTICOMPETITIVE AGREEMENTS

63. NAR's Handbook, Code of Ethics, and Standards of Practice, among other policies, impose rules, policies, and practices on all NAR members, including NAR MLSs. Certain of these rules, practices, and policies significantly restrain competition for the provision of buyer agent services and harm home buyers across the United States.

64. Compliance with NAR's rules is mandatory for NAR membership. NAR's Code of Ethics states that "[a]ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association."

65. Additionally, NAR's Handbook on Multiple Listing Policy provides that "Association and Association-owned MLSs must conform their governing documents to the mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as member boards and to ensure coverage under the master professional liability insurance program."

66. NAR's rules and policies include: (i) the Buyer Agent Commission Rule; (ii) a prohibition on disclosing to buyers the total commissions paid to brokers upon the sale of a house ("Concealment Rule"); (iii) rules permitting and encouraging buyer agents to represent to home buyers that their services are free ("Free-Service Rule"); (iv) rules allowing and making it easy for buyer agents to filter MLS listings to only those with high commissions ("Filter Rules"); (v) rules restricting sellers and seller-brokers' ability to modify the commissions offered to buyer agents after an offer to purchase the listed home has been made ("Commission Modification Rules"); and (vi) the restriction of access to lockboxes, which hold the keys to houses for sale, to only NAR members ("Lockbox Policy").

///

67. The NAR and its affiliates have a clear agreement: NAR members can participate in the MLS, and gain the benefits provided by NAR and the NAR MLS, as long as they agree to adhere to and enforce the anticompetitive restraints set forth in NAR's rules, practices, and policies. Thus, NAR and the NAR MLSs' adoption and enforcement of these rules, policies, and practices reflect concerted action between horizontal competitors and constitute agreements among competing real estate brokers that reduce price competition among brokers and lead to higher prices and lower quality service for American home buyers and others.

**I. The Buyer Agent Commission Rule**

68. The Handbook sets forth the Buyer Agent Commission Rule as follows: "In filing a property with the multiple listing service of an association of REALTORS®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants."

69. The Handbook further states that "multiple listing services shall not publish listings that do not include an offer of ***compensation expressed as a percentage of the gross selling price or as a definite dollar amount***, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."

70. This practice is virtually universally adopted. Indeed, "[e]very MLS in the U.S. requires that listing brokers offer compensation to buyer agents." This mandate is adhered to by Defendants SFAR and SDAR.

71. Defendant SDAR's rules state the following:

> **Rule 7.12 Unilateral Contractual Offer**. In filing a property with the MLS, the broker participant makes a blanket unilateral contractual offer of compensation to the other MLS broker participants for their services in selling the property. Except as set forth in Rule 7.15 below or pursuant to California Civil Code § 1087, ***a broker participant must specify some***

> ***compensation to be paid to the buyer's agent or a subagent and the offer of compensation must be stated in one, or a combination of, the following forms (1) a percentage of the gross selling price; or (2) a definite dollar amount. The amount of compensation offered through the MLS may not contain any provision that varies the amount of compensation offered based on conditions precedent or subsequent or on any performance, activity or event***. Furthermore, the MLS reserves the right to remove a listing from the MLS database that does not conform to the requirements of this section.[3]

72. Defendant SFAR has an almost identical Rule 7.12 that its members must adhere to:

> **7.12 Unilateral Contractual Offer; Subagency Optional**. In filing a property with the MLS, the Broker Participant makes a blanket unilateral contractual offer of compensation to the other MLS Broker Participants for their services in selling the property. Except as set forth in Rule 7.15, ***a Broker Participant must specify some compensation to be paid to either a buyer's agent or a subagent and the offer of compensation must be stated in one, or a combination of, the following forms (1) a percentage of the gross selling price; or (2) a definite dollar amount. The amount of compensation offered through the MLS may not contain any provision that varies the amount of compensation offered based on conditions precedent or subsequent or on any performance, activity or event***. Furthermore, the MLS reserves the right to remove a listing from the MLS database that does not conform to the requirements of this section.

73. As a result of the Rule, seller-brokers must make "blanket unilateral

[3] Available at http://media.sdar.com/media/Sandicor_Rules_and_Regulations_Document.pdf (last visited March 17, 2021).

unconditional offers of compensation to their adversarial buyer agents." These blanket offers relieve buyer agents of the need to compete on things like price and quality of services. Thus, the Buyer Agent Commission Rule reduces competition in the market for buyer agent services and harms home buyers in a number of ways.

74. First, through the Buyer Agent Commission Rule, Defendants act to sustain high commission rates for broker services. This commission rate is then baked into the price of the house, artificially raising home prices.

75. The Consumer Federation of America has explained, "[t]ypically, on either a 5% or 6% commission, 3% will be offered to brokers with buyer clients, and that commission split is disclosed to brokers on real estate firm and multiple listing service databases." The listing of the 3% split "then acts as a powerful force to discourage lower splits of 2% or even 1% because listing brokers, and their sellers, fear that properties carrying these lower splits will not be shown. As a result, 'a listing broker lists a split below' the standard industry level 'at their, and their clients', peril because of the risk that traditional brokers working with buyers will avoid this property. … This informal discrimination against price competitors is the most important factor that allows dominant brokers to maintain high and uniform prices." As Defendant Keller Williams has acknowledged in its instructions to seller-brokers regarding what to tell home sellers: "[y]ou're putting yourself at a disadvantage competitively when you reduce your commission."

76. Additionally, because the NAR and its members offer blanket, unilateral, unconditional commissions, brokers need not compete with respect to the quality of services in order to obtain higher commissions. For example, novice brokers who have just received their licenses can charge the same prices as highly skilled, long-practicing brokers. Similarly, to the extent a broker commission is calculated as a "percentage of the gross selling price," a buyer agent who facilitates the purchase of an $800,000 home will receive potentially two times as much as a buyer agent who facilitates the purchase of a $400,000 home, regardless of whether the higher compensation is commensurate

with the amount and type of services provided.

77. Indeed, the Consumer Federation has called brokers "a price-setting cartel." As the Federation explained, "[i]n a rational pricing system, home sellers and buyers would each pay for real estate brokerage services they receive." But, "[i]f sellers and buyers each separately negotiated compensation with their brokers, uniform [] commissions would quickly disappear."

78. Second, buyer agents "steer" home buyers to residential properties that offer higher commissions. Steering of home buyers to high commission homes reinforces high commission rates. It also reduces the quality of buyer agent services by incentivizing buyer agents to limit the homes they show prospective buyers to those that offer high commissions. Home buyers are therefore both more likely to pay a higher price for their home (since the buyer agent commission is baked in to the sale price), and less likely to be matched with the optimal home—the exact task the buyer agent is paid to do.

79. Fear of having buyers steered away from a property is also a strong deterrent to sellers who would otherwise offer lower buyer agent commissions, which further contributes to higher prices for buyer agent services.

80. The prevalence of such steering has been widely reported in government reports, economic research, and the trade press and is well understood by NAR, the Broker Defendants, and their coconspirators. For example, according to course materials provided at Keller Williams University, offering less than three percent in buyer agent commission on an MLS "will reduce the number of willing and qualified buyers that will see your home."

81. Steering is facilitated for buyer agents by the fact that the blanket commission offer must be made available to every buyer agent using the MLS. NAR's requirement that offers of compensation be expressed in specific dollar or percentage terms enables buyer agents to easily compare the financial compensation offered to them by home sellers and steer their clients to higher commission homes.

82. Thus, the Rule is designed to create tremendous pressure on sellers to offer the high, standard commission and to act as a powerful deterrent to anyone who may attempt to offer a discounted commission. As one commentator explained: "[e]ssentially, the MLS listing acts as a tool which competing brokers can use to help enforce a near uniform commission rate and drive out discounters."

83. The Broker Defendants' franchisees, agents, and other coconspirators have also utilized software technology to help facilitate steering based on MLS commission data and to impede buyers from learning about properties that offer discount buyer agent commissions. For example, NAR's affiliate, the Greater Las Vegas Association of Realtors ("GLVAR") uses for its MLS a software program called Matrix, which was designed and sold by CoreLogic. CoreLogic provides software and data services to most, if not all, of the NAR MLSs, including Defendant SDAR. Matrix allows brokers to provide tailored electronic listings to their buyer clients. Matrix automatically generates and regularly sends emails to buyer clients that describe properties for sale that match their search criteria. When brokers set up the Matrix program for their buyer clients, one of the fields in the software allows the brokers to filter listings according to the value of the buyer agent commission being offered. In other words, brokers can program the software to only send property listings to buyers that promise buyer agent commissions above a specified value.

84. GLVAR elected to adopt a version of the Matrix software that permitted brokers to exclude properties offering discount buyer agent commissions from Matrix-generated emails to buyer clients. A number of franchisees and Broker Defendant agents in at least the area covered by Greater Las Vegas have trained their realtors to insert 2.5 percent or higher as the minimum permissible buyer agent commission when using the Matrix system to send property listings to buyer clients. As a consequence, unbeknownst to them, buyer clients of those realtors often do not receive Matrix-generated emails that include properties offering a buyer agent commission of less than 2.5 percent, even if that property perfectly matches the buyers' search criteria.

85. As part of the DOJ's investigation into the NAR and anticompetitive practices in the real estate industry, the DOJ served a Civil Investigative Demand ("CID") on CoreLogic directing it to produce "all documents relating to any MLS member's search of, or ability to search, MLS listings on any of the Company's multiple listing platforms, based on (i) the amount of compensation offered by listing brokers to buyer agents; or (ii) the type of compensation, such as a flat fee, offered by listing brokers to buyer agents."

86. By encouraging and facilitating steering, and adhering to the "standard real estate commission," the Buyer Agent Commission Rule deters downward departures from the standard commission and enables brokers to avoid doing business with, or otherwise retaliate against, buyer agents who try to compete by offering significant discounts.

87. There is no pro-competitive justification for the Buyer Agent Commission Rule. Until the early 1990s, all brokers were seller-brokers or subagents of seller-brokers. Under this "almost universal sub agency system … brokers, even those working solely with buyers, were legally obligated to represent the interests of sellers." Because "nearly all brokers involved in transactions represented the seller either as the seller's agent or as the subagent of the listing [*i.e.*, seller's] broker," the seller's broker was paid by the seller and would then compensate the subagent working with the buyer.

88. With the emergence of brokers who were no longer sub-agents of the seller's broker but were instead working for the buyer, there was no justification for requiring buyer agents' commissions to be paid as a portion of the total commission. One industry participant acknowledged, "[w]ith the demise of subagency, there is little reason to keep inter-broker compensation. It does not make sense for listing brokers to pay buyers' brokers for the services the latter provides to buyers." As another commentator has written: the practice of "sellers' brokers specifying the fees that buyers' brokers charge to the latter's own clients, should be recognized" as "at least an

attempt to fix market prices. … There is no longer any reason to permit listing brokers [*i.e.*, seller-brokers] to set the default prices that these competing buyers' brokers charge to serve their own customers. The elimination of inter-broker compensation would diminish the ability of traditional brokers to frustrate vigorous price competition, and thus likely lead to a dramatic fall in broker revenues."

89. The reason for the Buyer Agent Commission Rule is clear: to maintain high broker commissions for NAR members at the expense of home buyers. In the absence of the Rule, buyers rather than sellers would negotiate buyer agent commissions, and brokers would compete with each other by offering lower commission rates and/or higher quality services.

**A. The Commission Concealment Rule**

90. The anticompetitive effects of NAR's Buyer Agent Commission Rule are magnified by additional rules adopted and enforced by Defendants. NAR's Commission Concealment Rule prohibits disclosing to prospective buyers the total commissions offered to buyer agents. So, while buyer agents can see the commission they will earn if their client purchases a property, NAR MLSs conceal this fee from the home buyers who will actually pay the commission through the home purchase price.

91. NAR's Commission-Concealment Rules lessen competition among buyer brokers by reducing their incentives to compete against each other by offering rebates. These rules also make potential home buyers both less likely and less able to negotiate a rebate off the offered commission. NAR's Commission-Concealment Rules encourage and perpetuate the setting of persistently high commission offers by sellers and their listing agents. This contributes to higher prices for buyer broker services.

92. The NAR has instituted a series of rules ensuring commission concealment from buyers. These rules are laid out in several places in NAR's Handbook, including Policy Statement 7.23, which states "the multiple listing service shall not publish the total negotiated commission on a listing which has been submitted to the MLS by a participant. The multiple listing service shall not disclose in any way the total

commission negotiated between the seller and the listing broker."

93. Simultaneously, the NAR rules mandate price information sharing among brokers through its MLS rules. This type of one-way information exchange agreement eliminates the need for buyer agents to compete on price by offering rebates or accepting lower commissions. It also encourages and enables brokers to set persistently high commission offers, leading to higher prices for buyer agent services. Additionally, since buyers cannot see commission offers, they cannot detect or resist steering. As explained above, steering results in higher prices and reduces the quality of buyer agent services for home buyers.

## II. The NAR's Free-Service Rule

94. The NAR's Free-Service Rule, which has been widely adopted by NAR MLSs, encourages buyer agents to mislead buyers into thinking that the buyer agent's services are free when they are not.

95. Until January 2021, NAR Ethics Standard 12-2 stated "REALTORS® may represent their services as 'free' or without cost even if they expect to receive compensation from a source other than their client provided that the potential for the REALTOR to obtain a benefit from a third party is clearly disclosed at the same time." Because buyer agents governed by NAR are technically paid through the seller-broker, those buyer agents can always tell their buyer clients that their services are free. As a result, buyers think they are paying nothing for buyer agent services.

96. Because buyers do not believe they are paying anything for brokerage services, they are unlikely to (1) attempt to negotiate a lower buyer agent commission and/or (2) search for or find attractive buyer agent rebate offers or other discounts. In these ways, NAR's Free-Service Rule leads to higher prices for services provided by buyer agents.

## III. The NAR's Commission Filter Rules

97. The NAR's Commission Filter Rules allow buyer agents to filter MLS listings that will be shown to buyers based on the level of buyer agent commissions

offered. Some MLSs further permit buyer agents not to show certain homes to potential home buyers if the buyer agent will make less money because of lower commissions, even though those homes otherwise meet the buyer's search criteria.

98. For example, according to Policy Statement 7.58 of NAR's Handbook "Participants may select the IDX listings they choose to display based only on objective criteria including … cooperative compensation offered by listing brokers."

99. These Filter Rules, which have been widely adopted by NAR MLSs, facilitate steering by helping buyer agents selectively conceal from potential home buyers any property listings offering lower buyer agent commissions. This reduces the quality of buyer agent services and raises prices for buyer agent services for home buyers.

**IV. Commission Modification Rules**

100. Even if a home buyer were to obtain enough information to negotiate a lower buyer agent commission, NAR's ethics rules expressly prohibit buyer agents from attempting to reduce buyer agent commissions offered on MLSs through the submission of purchase offers. While the NAR claims that brokers can negotiate their compensation at any time during the transaction, NAR's Standard of Practice 16-16 states: "REALTORS®, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation." In other words, it is an unequivocal violation of NAR's ethics rules for a buyer agent to even present an offer to a seller that is conditional on the seller reducing the buyer agent commission.

101. Defendant SDAR's rules explicitly state that:

> "The amount of compensation offered through the MLS may not contain any provision that varies the amount of compensation offered based on conditions precedent or subsequent or on any performance, activity or

event."

102. Defendant SFAR's rules similarly mandate that:

"The amount of compensation offered through the MLS may not contain any provision that varies the amount of compensation offered based on conditions precedent or subsequent or on any performance, activity or event."

103. To the extent buyer agents do seek to modify buyer agent commissions, the NAR illogically instructs buyer agents to attempt those modifications before even showing the property to any potential buyers. By requiring buyer agents willing to reduce buyer agent commissions to request those reductions prior to even showing the property to a potential buyer, NAR forecloses virtually all negotiation over the buyer agent commission. To comply, a buyer agent would effectively need to contact a seller-broker on his own to negotiate a reduction to his own commission before his client has even seen the potential home.

104. The NAR's rules also restrain negotiation of the buyer agent commission by providing that after the seller has received purchase offers, the seller-broker is prohibited from attempting to unilaterally modify the buyer agent commission that was offered on the MLS. NAR Standard of Practice 3-2 states: "Any change in compensation offered for cooperative services must be communicated to the other REALTOR® prior to the time that REALTOR® submits an offer to purchase/lease the property. After a REALTOR® has submitted an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction."

105. Consistent with the NAR's rules, the SFAR's rules state:

**Rule 7.16 Changes to Offer of Compensation by Listing Broker to All Broker Participants**. The listing broker may, from time to time, adjust the published compensation offered to all MLS Broker Participants with respect

to any listing by changing the compensation offered on the MLS or providing written notice to the MLS of the change. Any change in compensation will be effective after the change is published in the MLS, either through electronic transmission or printed form, whichever occurs first. The listing broker may revoke or modify the offer of compensation in advance as to any individual Broker Participant in accordance with general contract principles but ***in no event shall the listing broker revoke or modify the offer of compensation without the buyer broker's consent*** later than the time the buyer broker (a) physically delivers or transmits by fax or e-mail to the listing broker a signed offer from a prospective buyer to purchase the property for which the compensation has been offered through the MLS, or (b) notifies the listing broker in person or by telephone, or by electronic correspondence (fax, email, SMS, *et. al*.) that the buyer broker is in possession of a signed offer from a prospective buyer to purchase the property for which the compensation has been offered through the MLS and is awaiting instructions from the listing broker as to the manner of presentation or delivery of that offer. Any independent advance revocations, modifications of the offer or agreements between real estate brokers are solely the responsibility of such brokers and shall not be submitted to, published by, or governed in any way by the service.

106. Defendant SDAR has an identical Rule 7.16 which states:

The listing broker may revoke or modify the offer of compensation in advance as to any individual broker participant in accordance with general contract principles but in no event shall the listing broker revoke or modify the offer of compensation without the cooperating broker's consent later than the time the cooperating broker (a) physically delivers or transmits by fax or email to the listing broker a signed offer from a prospective buyer to

purchase the property for which the compensation has been offered through the MLS, or (b) notifies the listing broker in person or by telephone, fax or email that the cooperating broker is in possession of a signed offer from a prospective buyer to purchase the property for which compensation has been offered through the MLS and is awaiting instructions from the listing broker as to the manner of presentation or delivery of that offer.

107. As another example, MLS Listings Inc., one of the largest MLSs in Northern California states the following on its website to help explain the governing NAR rules:

> **Can I change my offer of compensation that I had offered to the cooperating agent in the MLS after the agent produces an offer signed by the buyer?**
>
> No. In no event shall the listing broker revoke or modify the offer of compensation later than the time the cooperating broker produces a prospective buyer who has signed an offer to purchase the property for which the compensation has been offered through the MLS (9.8).

108. The NAR imposes yet another restraint on negotiation by making it unethical for a buyer agent to urge the buyer to negotiate directly with the seller to reduce commissions. Since the vast majority of home buyers have limited or no familiarity with this market and believe that the buyer agent's services to them are "free," this restriction further restrains negotiations regarding buyer agent commissions.

**V. The NAR's Lockbox Policy**

109. The NAR and its members have further reduced competition for buyer agent services by limiting access to lockboxes to only those real estate brokers who are members of an NAR MLS. Real estate brokers keep, with permission from the sellers, keys to the houses for sale in lockboxes. This allows brokers to provide potential buyers with access to the homes while keeping the homes secure. The lockboxes are accessed by a real estate broker using a numerical code or digital Bluetooth® 'key'.

110. The NAR and NAR MLSs have adopted a series of rules (set forth in the NAR Handbook, Policy Statement 7.31) that limit access to lockboxes only to those real

estate brokers that are members of NAR and subscribe to the NAR MLS. Brokers that are not affiliated with NAR cannot access the lockboxes and cannot show their clients the homes listed for sale, thereby lessening competition for buyer agent services.

111. As described in more detail below, each of these rules and practices have operated to maintain high commission rates and degrade the quality of the services that home buyers retain buyer agents to receive. The rules have imposed higher buyer agent commissions, maintained (and even increased) those overcharges over time notwithstanding technology and other changes that should have substantially reduced commissions, and significantly impeded the ability of lower- cost alternatives to create a more competitive marketplace.

## VI. THE NAR REQUIRES LOCAL ASSOCIATIONS TO PARTICIPATE IN THE CONSPIRACY

112. The NAR successfully requires its members, including state and local realtor associations, as well as non-member brokers and agents operating in areas with NAR MLSs, to comply with the above anti-competitive rules, and with other rules contained in NAR's rules, practices and policies, including the NAR Handbook and the NAR Code of Ethics.

113. The NAR requires NAR members that own an MLS to comply with the mandatory provisions in NAR's Handbook on Multiple Listing Policy and with NAR's Code of Ethics. The Handbook states that an agreement by an association for the establishment of an MLS must include "roles and responsibilities of each association for enforcement of the Code of Ethics and the intent of the multiple listing service(s) to operate in compliance with the multiple listing policies of the National Association."

114. The NAR threatens its individual and association members with expulsion if they fail to comply with the Code of Ethics. NAR's Code of Ethics states that "[a]ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the

National Association."

115. A local realtor association owns each of the NAR MLSs, and those realtor associations are required by the NAR to ensure that their MLS and the MLS's participants adhere to the mandatory provisions in NAR's Handbook on Multiple Listing Policy. Because access to the NAR MLSs and other MLSs is commercially necessary, brokers and agents must comply with the mandatory provisions in NAR's Handbook. Without access to a local MLS, including the NAR MLSs, a broker or agent would be unable to list properties for sale in the centralized database or receive offers of compensation for finding a buyer for a listed property.

116. The role of a local realtor association is particularly important for home buyers as the local MLS provides the most up-to-date, accurate, and comprehensive compilation of the area's home listings. Listing brokers will use the MLS to market sellers' properties to other broker and agent participants in the MLS and, through those brokers and agents, to potential home buyers.

117. Further, one of the many benefits NAR provides to its realtor associations and the MLSs owned by those associations is professional liability insurance. To be eligible for this insurance, realtor associations and their MLSs must comply with the mandatory provisions in the Handbook on Multiple Listing Policy. The NAR threatens to withhold these insurance benefits from realtor associations and MLSs that do not comply with NAR's mandatory provisions. NAR's Handbook states that "[t]hose associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not approved by the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation."

118. The NAR reviews the governing documents of its local realtor associations to ensure compliance with its rules. The NAR also requires its local realtor associations to demonstrate their compliance with these rules by periodically sending their governing documents to NAR for review.

## VII. BROKER DEFENDANTS PARTICIPATE IN, FACILITATE, AND IMPLEMENT THE CONSPIRACY

119. As alleged above herein, the NAR requires its members that own an MLS to comply with the mandatory provisions in NAR's Handbook on Multiple Listing Policy and with NAR's Code of Ethics. The NAR and its affiliated associations and MLSs enforce the Handbook's rules, policies, and practices as well as the rules, policies, and practices codified in NAR's Code of Ethics.

120. The Broker Defendants orchestrated and participated in the conspiracy alleged herein by at least: (1) requiring their franchisees (and the agents employed by those franchisees) to comply with NAR rules including the Buyer Agent Commission Rule; (2) supervising, through their executives, NAR's operations including NAR's adoption, maintenance, and enforcement of the Buyer Agent Commission Rule; and (3) controlling local realtor associations by, for example, participating in the governance and management of those associations and encouraging the adoption of NAR's rules, including the Buyer Agent Commission Rule.

121. The Broker Defendants' rules and policies require their franchises and agents to (1) comply with NAR's Code of Ethics; (2) join and comply with the rules of the local realtor association; and (3) participate in and comply with the rules of the local MLS, which include the mandatory provisions of NAR's Handbook on Multiple Listing Policy.

122. Executives from Broker Defendants have also actively participated in the management and operation of NAR. NAR's board of directors promulgated the rules in NAR's Handbook and Code of Ethics, including the Buyer Agent Commission Rule, and many of those rules were developed and drafted by NAR's Professional Standards Committee. Senior executives of the Broker Defendants have served on NAR's governing board of directors. For example, Ronald J. Peltier, the Executive Chairman of HomeServices of America, and Nancy Nagy, President of Sotheby's International Realty, currently serve as directors of NAR. Bruce Aydt, Senior Vice President and General Counsel of Berkshire Hathaway HomeServices Alliance Real Estate is the

former Chair of NAR's Professional Standards Committee.

123. Executives of the Broker Defendants have also dominated the eight-person Leadership Team that manages NAR's day-to-day operations. For example, the 2021 President of the NAR's Leadership Team is Charlie Oppler, CEO of Prominent Properties, a Sotheby's International Realty franchisee, and its past President is Elizabeth Mendenhall, who was the CEO of RE/MAX Boone Realty in Columbia, Missouri. The President of NAR in 2019 was John Smaby, a sales agent at Edina Realty, which is a HomeServices of America company. NAR's Vice President of Association Affairs, Colleen Badagliacco, is an agent for Legacy Real Estate & Associates, which is a franchisee of a Realogy firm. The 2019 leadership team included John Smaby and Elizabeth Mendenhall, as well as Tracy Kasper, Vice President of Advocacy and a broker/owner of a Berkshire Hathaway franchisee.

124. The Broker Defendants also carry out the anti-competitive practices through participation in local real estate associations. Betty Taisch and Jeannie Anderson, real estate agents with Compass in San Francisco, have served as Directors of the California Association of Realtors for the 2019-2021 term. Eugene Pak, a real estate agent with Compass in San Francisco, is serving as a Director of the CAR for the 2021-2023 term. Richard Sax, a real estate agent with Compass in San Francisco, is listed as a Director-for-Life of the CAR. John Asdourian, a real estate agent with Sotheby's International Realty in San Francisco, has served as a Director of the CAR for the 2019-2021 term. David Parry, a real estate agent with Sotheby's International Realty in San Francisco, is serving as a Director of the CAR for the 2021-2023 term.

125. Executives of franchisees of the Broker Defendants have participated in and implemented the conspiracy through the governance of the local realtor associations that own and operate the NAR MLSs. Those executives and local realtor associations required compliance with the NAR rules, including the Buyer Agent Commission Rule, and adopted standard form contracts implementing the NAR rules.

126. The Broker Defendants also actively encourage their franchisees to be

involved in local realtor association governance. For example, Keller Williams' Policy & Guidelines Manual states that "[w]e encourage you to be actively involved to the greatest possible extent" and "[w]e encourage you to take an active role in any such local organization." The manual further states: "Please be very cooperative with other realtors for they hold the key to a great deal of information. With their help, you can become very successful. We cooperate and live by the spirit of cooperation with all other realtors and brokers."

## VIII. EFFECTS OF THE CONSPIRACY

127. Defendants' conspiracy has had the following anticompetitive effects, among others, in each area in which an NAR MLS operates, and nationwide:

- Home buyers have paid, through the purchase price of their homes, inflated buyer agent commissions and inflated total commissions;
- Inflated total commissions are incorporated into the home purchase price, thereby causing buyers to pay higher prices for homes;
- The retention of a buyer agent has been severed from the setting of the broker's commission; the home buyer retains the buyer agent, while the home seller sets the buyer agent's compensation;
- Price competition among brokers to be retained by home buyers has been restrained;
- Competition among home buyers has been restrained by their inability to compete for the purchase of a home by lowering the buyer agent commission; and
- The quality of buyer agent services has also been reduced through barriers that prevent buyer agents from presenting and receiving purchase proposals that reduce the buyer agent commission, thus making the proposals more attractive to and more likely to be accepted by sellers; and
- Broker Defendants have increased their profits substantially by

receiving inflated buyer agent commissions and inflated total commissions.

128. There is no pro-competitive benefit to Defendants' conspiracy. Defendants have successfully stabilized buyer agent commissions and significantly increased the dollar cost charged despite the diminishing role of buyer agents. According to data from the NAR, many homebuyers no longer locate prospective homes with the assistance of a broker, but rather independently through online services. Buyer agents increasingly have been retained after their client has already found the home the client wishes to buy. "One would have expected that an information and communication-based industry like real estate brokerage, would enjoy tremendous cost efficiencies from the development of the Internet, Databases, and other communication technologies. Yet it appears that traditional brokers generally have not passed on their cost savings to consumers in the form of lower fees." Despite their diminishing role, buyer agents continue to receive the same artificially elevated commission, due to Defendants' conspiracy.

129. Defendants' success in maintaining (and, in inflation-adjusted dollar terms, substantially increasing) the charge imposed by buyer agents despite the advent of new technologies stands in stark contrast to other industries. "[I]n almost every other consumer industry—booksellers, retailers, home appliances, insurance, banking, stock brokers—the introduction of Internet and discount sellers has been a phenomenal financial benefit to customers. Economists call this process of squeezing out transaction costs 'disintermediation.' If any industry is ripe for this, it is the $70 billion-a-year real estate brokerage market." Instead, "[e]ven as housing prices have changed over time and technological advances have arguably made the broker's job easier, commission rates in the industry have remained remarkably steady at around five to six percent."

130. Moreover, there is a disconnect between buyer agent costs and buyer agent commissions. While "competitive pressures in an industry ordinarily force competitors to adopt fee structures that reflect their costs, this has not occurred for real estate broker

fees." For example, buyer agent costs are similar regardless of the price of the home. As the Wall Street Journal has explained, "many, if not most, of the services that Realtors provide don't vary with the sales price, so the percentage fee should fall as home price rises." Instead, the broker commissions are "unrelated to either the quantity or quality of the service rendered or even to the value provided."

131. Even if there were any plausible pro-competitive effects, they would be substantially outweighed by the conspiracy's anticompetitive effects.

132. There is substantial economic evidence that Defendants' conspiracy has resulted in buyer agent commissions and total commissions that are inflated well above a competitive level nationwide.

133. Defendants' conspiracy has maintained broker commission levels at remarkably stable and inflated levels for the past two decades, despite the advent of the internet and the diminishing role of buyer agents. Between 2000 and 2017, the average commission nationally has been stable at a supra-competitive rate of between 5 and 5.4 percent regardless of changing market conditions.

134. Moreover, because housing prices have increased substantially in recent years (at a rate significantly exceeding inflation), and commissions are charged on a percentage of a home's sale price, the actual dollar commissions have become even higher. "For example, between 2001 and 2017, the average price of new homes in current dollars sold rose from $213,200 to $384,900, according to U.S. Census Bureau Statistics." As the Consumer Federation of America has observed, "[b]ecause the industry functions as a cartel, it is able to overcharge consumers tens of billions of dollars a year. Consumers are increasingly wondering why they are often charged more to sell a home than to purchase a new car."

135. The standard total broker commissions (*i.e.*, the aggregate commission paid to the seller-broker and buyer agent) in areas where the NAR MLSs operate is between five and six percent, substantially higher than in countries with competitive markets for residential real estate brokerage services. In a 2002 study titled "International

Residential Real Estate Brokerage Fees and Implications for the US," economists Natalya Delcoure and Norm Miller concluded: "Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand. … In the UK, the [total] commission rates average less than 2% … In New Zealand and South Africa, [total] commission rates average 3.14%. In Singapore, the [total] commission rates also tend to run around 3%." They also found variation within countries; in the United Kingdom, for example, Delcoure and Miller found that "1%-2% is typical; in very competitive areas 0.5- 0.75%; in low priced areas [for homes] as high as 3.5%." Ultimately, the economists concluded that, "based on global data, the [total] US residential brokerage fees should run closer to 3.0%."

136. The adverse economic impact of the conspiracy's restraints on price competition have been severe. The Consumer Federation of America indicated that "[i]f sellers and buyers each separately negotiated compensation with their brokers, uniform 5-6% commissions would quickly disappear."

137. Brian Larson, an attorney who has represented many MLSs, has observed that "[w]ith the demise of subagency, there is little reason to keep interbroker compensation." According to Larson, "[g]etting rid of interbroker compensation" [*i.e.*, payments from seller-brokers to buyer agents] would improve the market in several areas, including:

- "Buyer agent fees can be commensurate with the skill and experience of the broker and with the buyer's needs."
- "The market benefits from price competition for buyer-broker services."
- "The dangers of price fixing, and the claims by industry watchdogs that it exists now, will largely be addressed. Brokers will really be unable to tell what their competitors are charging for services, and there will be no incentive for commissions to be 'standard.'"

///

138. Because of the scope and magnitude of the overcharges at issue here, the economic cost to the plaintiff class and other consumers is enormous. Estimates of the amount of "annual broker fees consumers might save if there was effective price competition suggests as much as $30 billion or more annually."

139. Economists Hsieh and Moretti have suggested that "more than half of current commissions might be eliminated by competition." Natalya Delcoure and Norm Miller "found that U.S. broker fees should equal something closer to three percent."

## IX. CONTINUOUS ACCRUAL

140. During the years preceding the filing of this complaint, Defendant NAR and Broker Defendants in NAR MLSs repeatedly engaged in anticompetitive conduct, including implementing and enforcing the Buyer Agent Commission Rule and other anticompetitive NAR rules nationwide. Defendants continue to do so.

141. As a result of their conspiracy, Defendants repeatedly charged and received, and continue to charge and receive, inflated buyer agent commissions and total commissions that were paid by Plaintiff and the Class in connection with the purchase of residential real estate listed on one of the NAR MLSs. Each payment of these inflated commissions by Plaintiff and Class Members during the class period injured them and gave rise to a new cause of action.

## STATUTE OF LIMITATIONS

142. The running of the statute of limitations begins when the Plaintiff discovers the existence of a cause of action.

143. Plaintiff and the Class had no knowledge of Defendants' unlawful conspiracy and could not have discovered it by the exercise of due diligence until, at the earliest, November 19, 2020, the date the DOJ announced the settlement of its antitrust claims against the NAR.

144. Moreover, it was reasonable for Plaintiff and Class Members not to suspect that Defendants were engaging in any unlawful anticompetitive behavior. Plaintiff and

Class Members are unsuspecting home buyers who do not have in-depth knowledge or information about the real estate industry and are not well-versed with NAR's framework. Additionally, as alleged herein, the NAR's policies, rules and practices specifically prohibit the disclosure of total broker commissions to home buyers and encourage buyer agents to represent to their clients that they are receiving the brokers' services for free. As a result, the average home buyer does not appreciate that buyer agent services cost them anything, let alone that Defendants actively conspire together to maintain supra-competitive broker commissions.

145. For these reasons, the statutes of limitation applicable to Plaintiff's and Class Members' claims have been tolled with respect to the claims asserted herein.

146. Additionally, or alternatively, application of the doctrine of fraudulent concealment tolled the statutes of limitation on Plaintiff's and the Class Members' claims until at least November 19, 2020.

147. Defendants actively concealed their conspiracy by, for example, prohibiting the disclosure of total commissions to home buyers and encouraging brokers to represent to home buyers that their services are free of charge.

148. Moreover, Defendants' anticompetitive conduct was inherently self-concealing because the NAR tightly controls its regulated MLSs, agents, and brokers, and a reasonable buyer under the circumstances would not have had reason to suspect that they were being subjected to anticompetitive conduct. The conduct prohibiting NAR MLSs from disclosing to prospective buyers the amount of commission that the buyer agent will earn if the buyer purchases a home listed on the MLS, allowing buyer agents to misrepresent to buyers that a buyer agent's services are free, is inherently self-concealing. Likewise, conduct by Defendants to filter MLS listings based on the level of buyer agent commissions and to exclude homes with lower commissions is inherently self-concealing.

///

///

## CLASS ACTION ALLEGATIONS

149. Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and the following class:

> All persons who, since December 1, 1996 through the present, purchased residential real estate that was listed on an NAR MLS.

150. Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which any Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

151. **Ascertainability**: Membership of the Class is defined based on objective criteria, and individual members will be identifiable from Defendants' and public records.

152. **Numerosity**: The exact number of members of the Class is unknown and unavailable to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consists of at least thousands of individuals, and the members can be identified through Defendants' and public records.

153. **Predominant Common Questions**: The Class' claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members. Common questions for the Class include, but are not limited to, the following:

a. Whether Defendants entered into a conspiracy as alleged herein;

b. Whether the conspiracy was implemented in the areas in which the NAR MLSs operate;

c. Whether the conspiracy harmed competition as alleged herein;

d. Whether home buyers were harmed as a result of Defendants' anticompetitive conduct as alleged herein;

e. Whether buyer agent commissions were inflated as a result of the conspiracy;

f. Whether the competitive harm from the conspiracy substantially outweighed any competitive benefits; and

g. The appropriate class-wide measures of damages.

154. **Typicality**: Plaintiff's claims are typical of the claims of the other members of the proposed Class. Defendants' conduct that gave rise to Plaintiff's claims is the same for all members of the Class.

155. **Adequate Representation**: Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including antitrust violations. Plaintiff has no interest that is antagonistic to those of the Class. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor his counsel have any interest adverse to those of the other members of the Class.

156. **Substantial Benefits**: This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision- making.

157. Plaintiff reserves the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

///

## CLAIMS FOR RELIEF

### Count I
### Section 1 of the Sherman Act, 15 U.S.C § 1
### (Against All Defendants)

158. Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

159. Beginning in at least 1996, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

160. The misrepresentation as to the payment of brokerage commissions and the value of houses sold is an actual and proximate cause of harm to home buyers. The contract, combination, or conspiracy alleged herein has consisted of continuing agreements among Defendants and their coconspirators to set, raise, and maintain the level of broker commissions.

161. In furtherance of the contract, combination, or conspiracy, Defendants and their coconspirators have committed one or more of the following overt acts:

a. participated in the establishment, maintenance, and implementation of the Buyer Agent Commission Rule and other anticompetitive NAR rules;

b. participated in the establishment, maintenance, and implementation of rules by NAR associations and MLSs that implemented the Buyer Agent Commission Rule and other anticompetitive NAR rules; and

c. used their control over the NAR MLSs to force affiliated brokers, members, and franchisees of Broker Defendants to implement and adhere to the Buyer Agent Commission and other anticompetitive NAR rules in the areas in which the NAR MLSs operate.

162. Defendants' conspiracy has caused buyer agents to conceal total commissions, to misrepresent to buyers that buyer agents' services are free, to steer home buyers towards high commission listings, and to diminish the value of buyer

agent services by restraining competition on buyer agent commission fees in the home buying process. Defendants' conspiracy has also had the effect of excluding non-NAR-affiliated brokers from competing in the market for buyer agent services by restricting access to lockboxes, which is required in order for buyer agents to show houses for sale to their clients.

163. Defendants' conspiracy has also reduced competition among buyer agents, thereby requiring buyers to pay inflated prices for their homes and inflated buyer agent commissions. Reduced price competition among buyer agents has also reduced the quality of broker services provided to home buyers. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

164. Plaintiff and Class Members paid inflated home purchase prices and broker commissions throughout the class period in connection with the purchase of residential real estate listed on the NAR MLSs. Absent Defendants' conspiracy, Plaintiff and the other class members would have paid lower prices for their homes and lower commissions.

165. Plaintiff and Class Members also received diminished services from buyer agents as a result of the conspiracy. Absent this conspiracy, Plaintiff and Class Members would have received improved services in negotiating and reducing the purchase prices of their homes.

166. As a direct and proximate result of Defendants' past and continuing violations, Plaintiff and Class Members have been injured in their business and property and suffered damages in an amount to be proven at trial.

**Count II**
**Violation of the Cartwright Act, CAL. BUS. & PROF. CODE § 16720 *et seq.***
**(Against All Defendants)**

167. Plaintiff incorporates by reference and realleges each and every preceding paragraph as though fully set forth herein.

168. Defendants' acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*, which prohibits, *inter alia*, the combination of

resources by two or more persons to restrain trade or commerce or to prevent market competition. *See id*. §§ 16720, 16726.

169. Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anticompetitive scheme.

170. The relevant service market for the claims asserted herein is the market for buyer agent services. The relevant geographic markets for the claims asserted herein are the geographic areas in which NAR MLSs operate.

171. Defendants have market power in the foregoing market, as evidenced by their long-standing ability to maintain commissions at inflated levels. Defendants' anti-competitive conduct has led to the exclusion of viable market alternatives in the real estate buyer agent services market.

172. The misrepresentation as to the payment of brokerage commissions and the value of houses sold is an actual and proximate cause of harm to home buyers. The contract, combination, or conspiracy alleged herein has consisted of continuing agreements among Defendants and their coconspirators to set, raise, and maintain the level of broker commissions.

173. In furtherance of the contract, combination, or conspiracy, Defendants and their coconspirators have committed one or more of the following overt acts:

a. participated in the establishment, maintenance, and implementation of the Buyer Agent Commission Rule and other anticompetitive NAR rules;

b. participated in the establishment, maintenance, and implementation of rules by NAR associations and MLSs that implemented the Buyer Agent Commission Rule and other anticompetitive NAR rules; and

c. used their control over the NAR MLSs to force affiliated brokers, members, and franchisees of Broker Defendants to implement and adhere to the Buyer Agent Commission and other anticompetitive NAR

rules in the areas in which the NAR MLSs operate.

174. Defendants' conspiracy has caused buyer agents to conceal total commissions, to misrepresent to buyers that buyer agents' services are free, to steer home buyers towards high commission listings, and to diminish the value of buyer agent services by restraining competition on buyer agent commission fees in the home buying process. Defendants' conspiracy has also had the effect of excluding non-NAR-affiliated brokers from competing in the market for buyer agent services by restricting access to lockboxes, which is required in order for buyer agents to show houses for sale to their clients.

175. Defendants' conspiracy has also reduced competition among buyer agents, thereby requiring buyers to pay inflated prices for their homes and inflated buyer agent commissions. Reduced price competition among buyer agents has also reduced the quality of broker services provided to home buyers. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

176. Plaintiff and Class Members paid inflated home purchase prices and broker commissions throughout the class period in connection with the purchase of residential real estate listed on the NAR MLSs. Absent Defendants' conspiracy, Plaintiff and the other class members would have paid lower prices for their homes and lower commissions.

177. Plaintiff and Class Members also received diminished services from buyer agents as a result of the conspiracy. Absent this conspiracy, Plaintiff and Class Members would have received improved services in negotiating and reducing the purchase prices of their homes.

178. As a direct and proximate result of Defendants' past and continuing violations, Plaintiff and Class Members have been injured in their business and property and suffered damages in an amount to be proven at trial.

179. It is appropriate to bring this action under the Cartwright Act because many of Defendants' illegal agreements with third parties were made in California and

purport to be governed by California law, many affected consumers reside in California, several Defendants have their principal place of business in California and overt acts in furtherance of Defendants' anticompetitive scheme took place in California.

**Count III**
**Violation of the Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq.***
**Against All Defendants**

180. Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

181. Defendants committed acts of unfair competition, as described above, in violation of the Unfair Competition Law ("UCL").

182. Defendants' conduct constitutes an "unlawful" business practice within the meaning of the UCL, and includes, without limitation, the following:

a. Violating the Sherman Act, as set forth above;

b. Violating the Cartwright Act, as set forth above and

c. Engaging in anticompetitive conduct and restraining trade, and otherwise manipulating the market for residential real estate services in violation of the Sherman Act and Cartwright Act.

183. Defendants' conduct separately constitutes an "unfair" business practice within the meaning of the UCL because Defendants' practices have caused and are "likely to cause substantial injury" to Plaintiff and members of the Class that is not "reasonably avoidable" by them.

184. Defendants' conduct, as alleged herein, is and was contrary to public policy, immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers. Any purported benefits arising out of Defendants' conduct do not outweigh the harms caused to the victims of Defendants' conduct.

185. Defendants' conduct is also "unfair" because it is contrary to numerous legislatively-declared policies, as set forth in the Sherman Act, the Cartwright Act and California law. Here, Defendants' conduct not only violates the letter of the law, but it also contravenes the spirit and purpose of each of those statutes. The conduct threatens

an incipient violation of each of those laws and has both an actual and a threatened impact on competition.

186. Defendants' conduct, as described above, also constitutes a "fraudulent" business practice within the meaning of the UCL. Defendants' activity with respect to the MLS listing services and the market for real estate commissions fraudulently raised the prices of real estate commissions and real estate products, and other manipulative conduct that did not shift economic risk for the transaction to an arm's length counterparty. This conduct was designed to deceive — and did deceive — other market participants about the true supply and demand situation for real estate services and commissions in order to artificially increase prices in California and throughout the United States.

187. Plaintiff and members of the Class have suffered injury in fact and have lost money as a result of Defendants' violations of the UCL in that they paid more for the relevant services and products than they would have paid in a competitive market. They are therefore entitled to restitution and injunctive relief pursuant to California Business and Professions Code § 17203.

**Count IV**
**Unjust Enrichment**
**Against All Defendants**

188. Plaintiff re-alleges and incorporates the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

189. Defendants received benefits from Plaintiff and Class members and unjustly retained those benefits at their expense. For example, Plaintiff and Class Members paid supra-competitive commissions to agents employed by Broker Defendants. Plaintiff and the Class members also paid supra-competitive commissions to NAR members, who in turn pay dues to NAR for membership. These funds enable NAR to continue its operations, including the conspiracy to maintain artificially high commission rates. Defendants' financial benefits resulting from their unlawful and inequitable conduct are economically traceable to overpayments for buyer agent

commissions by Plaintiff and Class members.

190. Additionally, Defendants promulgated and enforced anticompetitive rules, including the Buyer Agent Commission Rule, Concealment Rules, Free-Service Rule, Commission Modification Rule, Filter Rule and Lockbox Policy in order to raise, set, and maintain high commission rates and otherwise reduce competition in the market for buyer agent services for their own gain, providing Defendants with economic, intangible, and other benefits.

191. Defendants unjustly retained those benefits at the expense of Plaintiff and Class members because Defendants' conduct damaged Plaintiff and Class members, all without providing any commensurate compensation to Plaintiff and the Class.

192. The benefits that Defendants derived from Plaintiff and Class members rightly belong to Plaintiff and Class members. It would be inequitable under unjust enrichment principles for Defendants to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

193. Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class members all unlawful or inequitable proceeds they received, and such other relief as the Court may deem just and proper.

**PRAYER FOR RELIEF**

Plaintiff requests relief as follows:

A. That the Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B. That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate Section 1 of the Sherman Act, 15 U.S.C. § 1 and violate the Cartwright Act and Cal. Bus. & Prof. Code Section 17200 *et seq*.;

C. That the Court award Plaintiff and the other members of the Class

damages and/or restitution in an amount to be determined at trial, as provided by law, determined to have been sustained as to each of them, in an amount to be trebled in accordance with the antitrust laws, and that judgment be entered against Defendants on behalf of Plaintiff and the Class;

D. That the Court award Plaintiff pre- and post-judgment interest;

E. That the Court award Plaintiff his costs of suit, including reasonable attorney's fees and expenses;

F. That the Court award Plaintiff and the Class a permanent injunction to permanently enjoin and restrain NAR from establishing the same or similar rules, policies, or practices as those challenged in this action in the future; and

G. That the Court award such other relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: March 19, 2021

Respectfully submitted,

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Yury A. Kolesnikov (SBN 271173)

s/ Francis A. Bottini, Jr.
Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002
fbottini@bottinilaw.com
achang@bottinilaw.com
ykolesnikov@bottinilaw.com

*Attorneys for Plaintiff Alfio Conti*